FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
JUN 15 2010

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

F I L E D
June 8, 2010

Lyle W. Cayce
Clerk

No. 09-70020

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

versus

JULIUS OMAR ROBINSON, also known as Face, also known as Scar, also known as Scarface,

        Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:05-CV-756

Before HIGGINBOTHAM, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Julius Robinson, a federal prisoner, was convicted of two murders and conspiring in the death of a third victim. He was sentenced to death. He seeks a certificate of appealability ("COA") to appeal the denial of post-conviction relief under 28 U.S.C. § 2255, alleging that he received ineffective assistance of coun-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

sel ("IAC") at sentencing and that the district court erred by denying his IAC claim without a hearing. We deny the application.

I.

A.

We described the events leading to Robinson's conviction and sentence in *United States v. Robinson* ("*Robinson I*"), 367 F.3d 278 (5th Cir.), *cert. denied*, 543 U.S. 1005 (2004). In summary, Robinson was a wholesale drug dealer operating in five states. In 1998, he ambushed and killed Johnny Shelton with an assault rifle because Robinson had mistaken Shelton for another man whom Robinson blamed for an earlier hijacking. Several months later, Robinson gunned down and killed Juan Reyes because Reyes was the brother-in-law of another drug dealer who had defrauded Robinson. Robinson was also involved in a broad conspiracy that led to the murder of a third man, Rudolfo Resendez.

B.

For these murders and his complicity in an ongoing criminal enterprise, Robinson was convicted and sentenced to death on three separate counts, to life imprisonment on two others, and to a consecutive 300-month sentence on another. *Robinson I*, 367 F.3d at 282. During the sentencing phase, the prosecution presented evidence of Robinson's likely future dangerousness, referring to his membership in a gang and two additional incidents from his past. Sarah Tucker, Robinson's former high school classmate, testified that he had once fired several shots into her truck and her grandparents' apartment while she sat parked in the driveway, because she owed him $120 for crack cocaine. Robinson was convicted of deadly conduct in Texas state court for that episode.

The prosecution also presented evidence that, while in prison awaiting trial for murder, Robinson ordered a hit on the life of Michael "One Love" Willi-

ams, who was from Robinson's hometown of Dermott, Arkansas, and who had testified against Robinson before the grand jury. According to one of Robinson's co-defendants, Nathan Henderson, Robinson said he hoped someone would "get" Williams. At one point, Robinson participated in a three-way phone call with his brother and aunt during which he said, "That dude One Love, man that dude right there go hard, Joe." Williams (i.e., One Love) testified at trial that he was accosted in Dermott by three young men who told him they would kill him for snitching on their leader in Texas. Williams eventually escaped from the three men. Robinson later told Henderson that the "youngsters" in Dermott "got" One Love.

The defense called numerous witnesses. Several of Robinson's former coaches and one former teammate testified that Robinson was polite, well-liked, and responsible. An employee at the computer training school where Robinson took classes testified to his good attendance and successful course work. The defense also called several witnesses from the facility where Robinson was incarcerated before trial. They testified that he was a quiet, courteous, and well-behaved inmate. On cross-examination, one of the witnesses admitted that Robinson had broken a rule by participating in a three-way telephone call.

Two members of Robinson's family testified. John Hollimon, Jr., his uncle, said that Robinson had been raised by his grandparents in Dermott when he was young and that that environment, though poor, was a loving one. When Robinson and his brother grew older, his mother, Rose Hollimon, brought the boys to Arlington, Texas, to live with her. There, according to John Holimon, Robinson lived in a dangerous environment and was forced to fend for himself. Holimon also said that Robinson had supported his grandparents in the past and was excited about his computer course.

Rose Holimon then described how she had married Robinson's father when she was fifteen years old and that her husband abandoned her several years

later. She left her sons with their grandparents, believing it would be the best thing for them. She admitted abusing alcohol and drugs while her sons lived with her in Arkansas. She also described Robinson as an average student.

The government and defense called witnesses to testify as to the likelihood of prison violence. The defense witness testified that there was a 20-30% chance that a capital inmate like Robinson would be involved in serious prison violence and a 1% chance such an inmate would commit murder in prison. The government witness opined that the main predictors of prison violence were young age and past violence. He also noted that Robinson was likely to be housed in a facility where he would interact often with other inmates and have telephone access.

### C.

Robinson unsuccessfully moved for post-conviction relief under § 2255, then filed an application for COA in the district court on two questions: whether he received IAC at the sentencing phase and whether the district court was required to hold an evidentiary hearing on that issue. The district court denied the application, and Robinson petitions this court for a COA on the same two issues.

### II.

A petitioner must obtain a COA as a "jurisdictional prerequisite" to appealing the denial of relief under § 2255. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). Where the district court has rejected a petitioner's constitutional claims on the merits, he must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encour-

agement to proceed further." *Miller-El*, 537 U.S. at 327 (citation omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that the petitioner will not prevail." *Id.* at 338. In our COA determination, we conduct a "threshold inquiry" consisting of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 336. In a death penalty case, we resolve any doubt about whether a COA should issue in favor of the petitioner. *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

### A.

Robinson presents two bases for his IAC claim. First, he alleges that his trial counsel did not adequately investigate and rebut the prosecution's evidence regarding future dangerousness—Robinson's alleged gang involvement, the shooting of Tucker's truck, and the purported hit order on Williams. Second, Robinson claims his trial counsel did not adequately investigate his life history, which would have uncovered additional mitigating evidence.

Reviewing a COA petition, we do not decide the merits of Robinson's IAC claims; indeed, we lack jurisdiction to do so. *Miller-El*, 537 U.S. at 336-37. That said, our threshold inquiry of the merits necessarily involves consideration of the elements of the underlying claim for which a COA is requested. *Miller v. Dretke*, 404 F.3d 908, 916 (5th Cir. 2005). To prove IAC, Robinson must show that (1) counsel's performance was deficient, that is, below an objective standard of reasonableness; and (2) the deficient performance prejudiced his defense, that is, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 916-17 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984)). Under *Washington*'s first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Washington*, 466

U.S. at 689. Under the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If a court concludes that "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed" without analyzing the objective reasonableness of counsel's performance. *Id.* at 697.

We first address Robinson's contention that sentencing counsel failed adequately to investigate and rebut evidence of future dangerousness. With regard to the alleged hit order from prison, Robinson now produces declarations of those involved in accosting Williams, and Williams himself, denying that the three young men were acting under Robinson's orders. Robinson also claims his words "that dude [Williams] right there go hard" were not an instruction to kill Williams, but rather a comment that Williams would do or say anything. On the other hand, none of those declarations rebuts Henderson's testimony concerning Robinson's comments about "get[ting]" Williams before and after the incident, and, as the district court observed, the declarations themselves are contradictory in some respects.

As for the shooting of Tucker's truck, Robinson proffers evidence that he did not know Tucker was in the vehicle. Robinson's companion during the shooting now claims, in contradiction to the earlier testimony that he and Robinson were elsewhere during the shooting, that neither of them saw Tucker inside the truck. According to Robinson, that evidence suggests he was not attempting to murder Sarah Tucker but rather was spraying bullets into her truck and grandparents' apartment "in frustration." Robinson's § 2255 counsel also interviewed Robinson's defense counsel for the deadly conduct prosecution, who avers that Robinson's plea to a third-degree felony and a relatively light sentence—five years of probation and deferred adjudication—confirms the "minor nature" of the crime.

Robinson also claims that his trial counsel should have suppressed any evidence of his affiliation with the Dermott Crips gang under *Dawson v. Delaware*, 503 U.S. 159, 165-67 (1992). *Dawson* held that a stipulation to the defendant's membership in the Aryan Brotherhood prison gang was irrelevant to his sentencing and led to constitutional error, because the only information presented about the gang was its racist beliefs. *Id.* at 162, 165. But had the prosecution given some other justification for referring to the gang, such as a reputation for violence, it would have presented "a much different case." *Id.* at 165. That was precisely the reason for linking Robinson to the Dermott Crips, so references to the gang were relevant.

Alternatively, Robinson argues his lawyers should have interviewed the police chief or consulted an expert to testify that the Dermott Crips were "nothing more than a group of adolescent hoodlums" rather than a "fearsome gang." But in his own brief, Robinson cites trial testimony from Terence Holimon that already presented a similar view to the jury.

After a threshold inquiry into Robinson's complaints that his trial counsel failed adequately to investigate and rebut evidence of future dangerousness, we conclude that no reasonable jurist would find that Robinson was prejudiced by the above alleged deficiencies. Even if Robinson had been able to introduce all of his newfound rebuttal evidence, the jury would have been left with plausible evidence that Robinson ordered a hit from prison; his open admission that he fired shots into a car and apartment in anger over a $120 debt; and nothing new about the Dermott Crips.

And most importantly, Robinson's two brutal murders and complicity in a third would have remained in the fore. Though the future dangerousness evidence was a significant element in the verdict, *see Robinson I*, 367 F.3d at 283, no jurist of reason would believe that the dent in that evidence, which Robinson alleges, would have created a reasonable probability of a different verdict.

7

B.

Robinson claims he received IAC because his trial counsel failed adequately to investigate and present mitigating evidence about a rocky upbringing and childhood exposure to brain-damaging substances. We consider these claims in turn.

Robinson proffers new witness statements to show that his childhood was less structured and rougher than was indicated by John Holimon's and Rose Holimon's testimony at trial. Some of the new evidence is cumulative of what the jury heard: Rose's drug abuse, her decision to abandon Robinson to his grandparents, his grandfather's blindness, and Robinson's dangerous years as a teenager in Arlington. Some of the information is new: allegations of physical fighting between Robinson's parents (some, however, before Robinson's birth); the alleged beating Robinson suffered as part of his initiation into the Dermott Crips "pseudo-gang;"[1] the allegation that Robinson was abusing alcohol by the time he reached middle school; and a brief, uncorroborated suggestion by his father that a neighbor sexually touched Robinson when he was five years old.

Robinson also offers new evidence that brain damage caused by exposure to alcohol in the womb and to pesticides as a young child mitigates his culpability. That evidence is scant on specifics. He claims, for instance, that the effects of *in utero* alcohol exposure were apparent at his birth, but the only physical evidence he offers is that his birth weight was five pounds, six ounces. He also claims that his grandparents' home in Dermott was "very near" a farm that was crop-dusted regularly with pesticides. He suggests that as a result he was likely exposed to two common, highly-toxic pesticides used to control *mosquitoes* in Arkansas, repeated exposure to which can cause cognitive and emotional difficul-

---

[1] Robinson is careful not to acknowledge the Dermott Crips as an actual gang, perhaps because, to rebut future dangerousness evidence, he also insists that they were "nothing more than a group of adolescent hoodlums."

ties.

Robinson insists that his early difficulties in school and his struggle to obtain a C-minus grade point average by the time he graduated high school are direct evidence of fetal alcohol and childhood pesticide exposure. He also offers the statement of a neuropsychologist that Robinson exhibits "subtle cognitive deficits" that are "consistent with"—but not indicative of—exposure to the two pesticides.

Any reasonable jurist would agree with the district court's holding that neither strand of Robinson's new mitigation evidence shows IAC. With respect to the new evidence of a difficult childhood in Dermott, Robinson has not made a substantial showing that the omission of that evidence was prejudicial. Robinson's case for a difficult childhood's mitigating his culpability is far less compelling than the showing in recent cases in which the Supreme Court found the omission of mitigation evidence prejudicial.[2]

As for Robinson's claim that childhood brain damage reduces his culpability, the supporting evidence is, even under the most generous interpretation, exceedingly thin. No reasonable jurist would find its omission prejudicial. Because Robinson has not shown that reasonable jurists could disagree with the district court's denial of his IAC claims, we deny his application for a COA on those grounds.

---

[2] *See Rompilla v. Beard*, 545 U.S. 374, 391-92 (2005) (Rompilla was repeatedly beaten by his father, was locked with his brother in an excrement-filled dog pen, and grew up without proper clothing or indoor plumbing); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (Wiggins's alcoholic mother left him alone with his siblings for extended periods to beg for food or eat paint chips, his mother beat him when he broke into the kitchen to get food, he was hospitalized when his mother pressed his hand to a stove burner, and he was repeatedly raped and sexually abused in foster care and a Jobs Corps program); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (Williams was repeatedly and severely beaten by his father, his parents were imprisoned for criminal neglect, he was abused in foster care, and he was borderline mentally retarded).

### III.

Robinson claims that the district court erred by disposing of his § 2255 motion without a hearing. The court should hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The court denied a hearing because it had "decided [his] claims either by assuming that everything Robinson alleges is true or based on legal, not factual bases."

We review the denial of an evidentiary hearing in a § 2255 proceeding for abuse of discretion. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). To prove abuse of discretion, a petitioner must "produce independent indicia of the likely merit of [his] allegations." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006). Contested factual issues may not be decided on the basis of affidavits alone unless the affidavits are supported by other evidence in the record. *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. Unit B Jan. 1981).

Robinson's chief complaint is that the court accepted as fact, without corroboration in the record, his trial counsel's assertion that they had strategic reasons for not presenting evidence about the Dermott Crips. Even if we assume *arguendo* that this was an improper factual determination outside of a hearing, it was harmless. The court relied on the "strategic reasons" of trial counsel at two points in its decision: in finding counsel were not ineffective for failing to *rebut* evidence about the dangerousness of the gang, and (ironically) in finding counsel were not ineffective for failing to *present* evidence about the gang's dangerous impact on Robinson's upbringing. Both of those conclusions were also supported by alternative grounds, including other evidence that counsel had not been deficient, and also—regardless of counsel's adequacy or lack thereof—the finding that any hypothetical deficiency was not prejudicial.

Robinson points to three other places in the court's opinion that, he claims, amount to improper factual determinations: (1) the court's comment that the

declaration of Robinson's companion during the Tucker shooting was of questionable credibility, because it contradicted his previous sworn testimony; (2) the court's agreement with the government that pleas to lesser charges, like Robinson's plea in the Tucker shooting, are common and do not necessarily indicate that the factual basis of an original greater offense is incorrect; and (3) the court's faulting of Robinson for failing to support with useful documentation his assertion that trial counsel spent inadequate time meeting with him.

The first two supposed "fact-findings" are uncontroversial and uncontroverted statements of the obvious. The third is not a fact-finding at all, nor is it, as Robinson alleges, an unfair denial of the opportunity to prove that his attorneys inadequately prepared; if Robinson wanted to support his contentions with additional documentation, he was free to do so. Because Robinson has not shown that the district court erred by denying his motion for a hearing, we deny his petition for a COA on that ground.

The application for a COA is DENIED.

A true copy
Attest:
Clerk, U.S. Court of Appeals, Fifth Circuit
By _____
Deputy
New Orleans, Louisiana

JUN 0 8 2010